Nora C. **BELL**, Plaintiff-Appellant,

v.

**BIRMINGHAM LINEN SERVICE**, etc.,
Defendant-Appellee.

No. 81–7849.

United States Court of Appeals,
Eleventh Circuit.

Sept. 30, 1983.

Robert L. Wiggins, Jr., Birmingham, Ala., for plaintiff-appellant.

Engel, Hairston, Moses & Johanson, William B. Hairston, Jr., Birmingham, Ala., Elarbee, Clark & Paul, Robert J. Martin, Jr., Atlanta, Ga., for defendant-appellee.

Before TJOFLAT, HILL and JOHNSON, Circuit Judges.

TJOFLAT, Circuit Judge:

Nora Bell brought this suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e—2000e–17 (1976 & Supp. V 1981) alleging that Birmingham Linen Service declined to promote her, or "constructively demoted" her, because she was a woman. Following a non-jury trial, the district court concluded that Ms. Bell had failed to carry her burden of proving by a preponderance of the evidence that she was the victim of gender discrimination. The district court erred in applying the relevant legal principles; we therefore vacate the judgment and remand the case for additional factual findings under the correct legal standards.

## I.

Birmingham Linen Service (BLS) operates an industrial laundry in Birmingham, Alabama. Nora Bell works as a presser in that laundry, and has worked for BLS some

23 years. Local 218 of the Laundry, Dry Cleaning, and Dye House Workers Union represents BLS' employees. A collective bargaining agreement between Local 218 and BLS governs the terms and conditions of employment of BLS' workers.

Article 18 of that agreement provides for a posting and bidding procedure to fill job vacancies within the collective bargaining unit. Under Article 18, both immediate job openings and trainee positions must be posted on the employee bulletin board for three working days so that bargaining unit employees may bid for them. Assignments to these jobs and training positions must be made from the bidding. A job will not be considered to be open, however, if a trainee has bid on the job previously and is willing to accept the new assignment. Thus, receipt of a trainee position is a stepping-stone to filling a position that subsequently comes open.

We are hampered in our exposition of the events forming the background of this dispute because the district court failed to make findings concerning many of the basic, subsidiary facts which are unclear or disputed in the record. In March or April of 1977, Richard Day retired from his position as "washman" in BLS' washroom department.[1] On July 12, 1977, BLS' production manager, Gus Westbrook, posted a bid for an "extra washman" position.[2] Westbrook took down the bid sheet on July 18, 1977. Four persons bid on the position: Nora Bell and three males, including Waddell Mason. Ms. Bell was the most senior employee who bid on the job. Westbrook awarded the position to Waddell Mason.

Bell complained to her union representative, Georgia Robinson, that she should have been awarded the extra washman position. Bell and Robinson went to see Westbrook to determine why Bell had not received the position. Westbrook apparently told them that Mason was more qualified. Bell and Robinson then met with plant manager Charles Jones on Friday, August 5, and complained that the job should have been awarded to Bell, the most senior bidder. After that meeting, BLS awarded the position to Ms. Bell. She was told to report to the washroom on Monday, August 8.

When Bell arrived in the washroom on August 8, Westbrook apparently told her that she would be performing "pulling" and "loading" functions.[3] Bell replied that the pulling and loading tasks were not part of the washman position upon which she had bid. Westbrook then offered Bell the apron that pullers wear to keep their clothing dry, and Bell refused to take the apron. Bell left the washroom to see plant manager Jones, who apparently told her to return to the washroom and talk with Westbrook.

Accompanied by union steward Robinson, Bell then met with Westbrook. Westbrook apparently told them that he gave Waddell Mason the job because he had experience in the washroom. He also stated, according to the testimony of both Bell and Robinson, that he would not put Nora Bell in the washroom because if he did, "every woman in the plant would want to go into the washroom." The district court, deciding the credibility of the evidence, specifically

1. It is undisputed that all washroom employees, including washmen, are men, and that no female has been employed in the washroom in over 30 years. It is also undisputed that washroom positions are among the highest paid positions in BLS' plant.

2. "Extra washman" is not a job listed in the collective bargaining agreement. The positions listed there are "washman" and "washman-trainee." Westbrook testified that the "extra washman" label for the job opening was a mistake, and that the posting should have read "washman-trainee."

3. As the terms imply, these functions involve loading linen into, and pulling linen out of, washing machines. Apparently, it is physically strenuous work and not an ordinary part of the "washman" function. Washmen sort the linen according to the type involved, determine the nature and degree of the soil, and then decide which formula and which chemicals should be used to clean the linen.

found that Westbrook made this statement, or a similar statement in substance, to Bell and Robinson.

Bell then left the washroom, and returned to her job as a presser. She left work that day, August 8, 1977, and filed both a grievance with her union and a charge of gender discrimination with the Equal Employment Opportunity Commission (EEOC). She filed a second, amended charge with the EEOC on September 13, 1978, alleging that Westbrook harassed and intimidated her in retaliation for filing the earlier charge.

Pursuant to Article 27 of the collective bargaining agreement, the dispute went to arbitration. The arbitrator, in his decision of March 7, 1978, found that previous bid awards had been made according to seniority, not qualifications. He also found that Bell possessed sufficient qualifications, under the contract, to have been awarded the job and been trained for it. The arbitrator found that she met all specified criteria for the job. He decided that BLS had violated the contract in two ways. First, it created a "changed" job, that of an extra washman, by combining the duties of a "hydraulic and tumbler operator" (also called an "extractor operator" in the plant) and of a washman, without notifying the union and discussing the change. (This finding pertains to BLS' effort to impose the pulling and loading tasks on Bell.) Second, the arbitrator determined that BLS, either wittingly or unwittingly, violated the contractual proscription against gender discrimination by refusing to award Bell the job because of her sex. The arbitrator ordered that the extra washman position be abolished and that washroom vacancies be awarded on the basis of seniority. He also awarded Bell back pay for the difference between her current hourly rate and the washman rate. Bell received $631.29 pursuant to this award, covering the period from August 16, 1977, to March 17, 1978.

BLS defended in the EEOC proceeding by contending that Bell was denied the vacant extra washman position because she was less qualified than Waddell Mason, the male initially selected for the position. Bell also contended that she was offered the "puller" job previously held by Mason. The EEOC made its determination on November 30, 1978. It found reasonable cause to believe Bell's allegation that she was denied the extra washman position because of her sex.[4]

The EEOC based its determination on a number of underlying findings. First, seniority had been the governing factor prior to the Bell incident. Second, no female had ever been assigned to the washroom. Third, the job BLS offered Bell as a puller was dissimilar to the extra-washman job she had been denied. The EEOC also cited the evidence indicating Westbrook's sexual bias, and the arbitrator's determination that gender was a factor in BLS' decision. Finally, the EEOC rejected Bell's charges of retaliatory harassment and discrimination stemming from her earlier charge of discrimination filed with it.

Bell originally brought this action as a class suit on behalf of a putative class of women who are employed, were employed, or were wrongfully rejected for employment by BLS. In an amended complaint filed March 26, 1980, she alleged that BLS maintained a pattern and practice of gender discrimination in hiring, initial job assignments, promotions, transfers, wages and other terms and conditions of employment. Bell also reiterated her individual claims of discriminatory nonpromotion and retaliation. Bell also complained that she was denied equal pay for work of equal value. The complaint alleged violations of Title VII and of the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (1976).

In narrowing the issues for trial, the district court ruled that all the allegations of discrimination except the failure-to-pro-

---

4. We have held that such a finding by the EEOC is admissible evidence and is "highly probative of the ultimate issue involved in such [Title VII] cases." *Smith v. Universal Servs., Inc.,* 454 F.2d 154, 157 (5th Cir.1972). *See*

*Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

mote and retaliation claims were beyond the scope both of the actual EEOC investigation and of what the EEOC reasonably could have been expected to investigate based upon the original charge filed with it. The court therefore granted BLS summary judgment as to all allegations in Bell's complaint except those pertaining to its promotion practices. Bell does not challenge this ruling on appeal. The court also granted BLS' motion to deny the suit class action status since Bell filed no response to the motion and no other material in support of her class claims.

After a two-day trial, the district court found that Bell did make out a prima facie case as to her promotion, or constructive demotion, claim under *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The court found that a vacancy existed, that she applied for it, that she was capable of being qualified for the job with reasonable training, and that the job was later filled by a male. The court further found that it was not necessary for a person to "pull and load" to train for the washman position, and that pulling and loading had not previously been a criterion for obtaining the job of washman.

Applying *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the court stated that a burden of production shifted to BLS to articulate a legitimate, nondiscriminatory reason for its refusal to place Bell in the washman position or its placing increased burdens on the job after Bell applied for the position. The court summarized BLS' position as being that Mason, the male who ultimately received the job, was already qualified for the job and had effectively been filling it. The court thus found that BLS satisfied its burden of production. The district court reasoned that BLS had rebutted the presumption of discrimination created by Bell's prima facie case; Bell

therefore had to show that BLS' proffered reasons were mere pretext without substance, a task that merged with her ultimate burden of persuading the court she was the victim of intentional discrimination.

The court made additional findings, including, inter alia, that Westbrook had made the aforementioned sexist statement, that no female employee had worked in the washroom in over thirty years, and that it was not necessary to learn pulling and loading to be a washman. Citing *Rohde v. K.O. Steel Castings, Inc.,* 649 F.2d 317 (5th Cir. Unit A 1981),[5] the court concluded:

> [T]he real issue in this case, notwithstanding any comments made by Westbrook or the findings of the EEOC or the arbitration decision, is whether [BLS'] deliberate effort to place Mason in the position was motivated by matters relating to sex *or* whether this effort was motivated by Mason's prior experience and ability to perform the job without further training.

Record, vol. 1, at 92 (emphasis added).

The court found that the initial reason for posting the "extra washman" position on July 12, 1977, was to add a proper title to a position that Mason already occupied de facto, due to his incumbency in the washroom. Although this may have breached the collective bargaining agreement, the court concluded it did not reflect an intent to discriminate. It found that BLS' original intent was that the "extra washman" would perform other duties such as pulling and/or loading. The district court thus implicitly rejected its earlier suggestion that the pulling and loading requirements were placed on Bell to discourage her from taking the job. The court's ultimate conclusion was that the intent behind the whole procedure was to leave Mason in his same position but to change his job title. The complications that arose from the bid of a more senior employee,

**5.** *Rohde,* although apparently decided after *Texas Dep't of Community Affairs v. Burdine,* adverts neither to *Burdine* nor *Burdine's* clarification of a Title VII defendant's burden of rebuttal. *Burdine,* and our subsequent cases interpreting *Burdine,* largely undermine *Rohde's* discussion of this issue. *Compare Rohde,* 649

F.2d at 322–23 *with, e.g., Perryman v. Johnson Prods. Co.,* 698 F.2d 1138, 1142 (11th Cir.1983) *and Lincoln v. Board of Regents of the Univ. Sys.,* 697 F.2d 928, 937 (11th Cir.1983), *petition for cert. filed,* 51 U.S.L.W. 3904 (U.S. June 14, 1983) (No. 82–2050).

Bell, for the job related to possible violations of the collective bargaining agreement and not the civil rights laws. Concluding that Bell was not the victim of intentional discrimination, the district court entered judgment for BLS.

## II.

The basic analytical framework governing claims of disparate treatment and/or disparate impact under Title VII has been set forth in numerous opinions of this court, and we decline to fill the pages of the Federal Reporter by once again trodding that well-worn path.[6] This is a disparate treatment claim. The Supreme Court has set forth the elements of a prima facie disparate treatment claim, and the mechanics of burden-shifting once such a claim has been established, in *McDonnell Douglas v. Green,* as clarified in *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), and, most importantly, *Texas Department of Community Affairs v. Burdine.*

The Supreme Court, and this court, have stressed time and again that the four-part *McDonnell Douglas* test for establishing a prima facie case of disparate treatment is not intended to be a Procrustean bed within which all disparate treatment cases must be forced to lie. The Court in *McDonnell Douglas,* recognizing the wide variety of circumstances from which disparate treatment claims might arise, took pains to point out that its specification of the prima facie proof required of a Title VII plaintiff "is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. The *Furnco* court reiterated that "[t]he method suggested in *McDonnell Douglas* for pursuing this inquiry [whether disparate treatment occurred] ... was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco,* 438 U.S. at 577, 98 S.Ct. at 2949.

The *McDonnell Douglas* method of establishing a prima facie case addresses two evidentiary problems common to most Title VII cases: (1) direct evidence of discriminatory intent will most likely be nonexistent or difficult to prove; and (2) the employer enjoys greater access to proof of its reasons for its own employment decisions. *See Loeb v. Textron,* 600 F.2d 1003, 1014 (1st Cir.1979). *McDonnell Douglas* therefore allows the plaintiff to shift a burden of *production,* not persuasion, to the defendant once the plaintiff negates "the two most common legitimate reasons" for an employment decision: lack of qualifications or absence of a job vacancy. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866 n. 44, 52 L.Ed.2d 396 (1977).

A prima facie case under *McDonnell Douglas* raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.... [W]e know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is *more likely than not* the employer ... based his decision on an impermissible consideration such as race.

*Furnco,* 438 U.S. at 577, 98 S.Ct. at 2949–50 (citation omitted).

■ It should be clear that the *McDonnell Douglas* method of proving a prima facie case pertains primarily, if not exclusively, to situations where direct evidence of discrimination is lacking. It would be illogical, indeed ironic, to hold a Title VII plaintiff presenting direct evidence of a defendant's intent to discriminate *to a more* stringent burden of proof, or to allow a defendant to meet that direct proof by merely articulating, but not proving, legiti-

---

**6.** Recent and thorough expositions of those fundamental principles may be found in, e.g., *Eastland v. TVA,* 704 F.2d 613 (11th Cir.1983),

and *Lee v. Russell County Bd. of Educ.,* 684 F.2d 769 (11th Cir.1982).

mate, nondiscriminatory reasons for its action.

Following these principles, this court has held that where a case of discrimination is proved by direct evidence, it is incorrect to rely on a *McDonnell Douglas* rebuttal. *Lee v. Russell County Board of Education,* 684 F.2d 769, 774 (11th Cir.1982). If the evidence consists of direct testimony that the defendant acted with a discriminatory motive, and the trier of fact accepts this testimony, the ultimate issue of discrimination is proved. Defendant cannot refute this evidence by mere articulation of other reasons; the legal standard changes dramatically:

> Once an [illegal] motive is proved to have been a significant or substantial factor in an employment decision, defendant can rebut only by *proving* by a preponderance of the evidence that the same decision would have been reached even absent the presence of that factor.

*Id.* (citing *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471) (emphasis added); *accord Perryman v. Johnson Products Co.,* 698 F.2d 1138, 1143 (11th Cir.1983); *see Ramirez v. Sloss,* 615 F.2d 163, 168 (5th Cir.1980).

The district court in this case specifically accepted as credible testimony indicating that BLS' decision-maker, Gus Westbrook, stated that he would not allow Bell into the washroom because if she were allowed in, all women would want to enter.[7] This testimony is "highly probative evidence" of illegal discrimination. *Lee,* 684 F.2d at 775. *Cf. Eastland v. TVA,* 704 F.2d 613, 626 (11th Cir.1983) (testimony of selecting supervisor's racial bias, plus other evidence, defeated defendant's *McDonnell Douglas* rebuttal). The district court did not make any findings that Westbrook put aside his bias when he imposed the pulling and loading functions on Bell. Absent such a finding, it is impossible to conclude that BLS met its heavy burden of proving, under *Lee, Perryman,* and *Mt. Healthy,* that it would have reached the same decision without the presence of gender discrimination. This case must be remanded to the district court so that the court may evaluate the evidence under the *Mt. Healthy* standard.

The ultimate question in this case, the existence of discriminatory intent *vel non,* is a factual matter. *See Pullman-Standard v. Swint,* 456 U.S. 273, 289–90, 102 S.Ct. 1781, 1790–91, 72 L.Ed.2d 66 (1982). Bell urges us to reverse and remand this case for entry of judgment, since the district court's findings are infirm because of its erroneous view of the law *and,* in her view, "the record permits only one resolution of the factual issue." *Id.* at 292, 102 S.Ct. at 1792. We decline Bell's tempting invitation because we believe the district court's factual findings are inadequate to allow us to draw this conclusion.

To guide the district court, however, we emphasize those factors or reasons articulated by BLS which are *irrelevant,* as a matter of law, to the court's determination. The sole question before the district court on remand is whether Westbrook, and therefore BLS, imposed the pulling and loading tasks on Bell as a condition of the extra washman job in significant part because of her gender.[8] Mason's allegedly superior qualifications for the position have no bearing on the reasons BLS imposed the pulling and loading functions on Bell. For both logical and legal purposes, BLS abandoned its position that Mason deserved the job because of his superior qualifications when it agreed on August 5 that, notwithstanding anyone's qualifications, Bell would receive the posted vacancy.

Similarly, Westbrook's original intent, if any, simply to make official Mason's de facto occupancy of the position is irrelevant.

---

7. Since the district court had the advantage of observing the witnesses and evaluating their credibility first-hand, its findings of fact in this regard deserve special deference. *Lincoln v. Board of Regents of the Univ. Sys.,* 697 F.2d 928, 939 (11th Cir.1983).

8. It is undisputed in the trial record—as opposed to the EEOC proceedings—that Bell was offered the job, and that she left the position because Westbrook made pulling and loading a prerequisite to retaining the job.

When BLS agreed to give Bell the job on August 5—and all parties agree that this occurred—the only question for the district court to determine became: what was Westbrook's intent *at the time* he imposed the pulling and loading functions on Bell? Did sexual bias play a significant role in this decision?[9]

We emphasize that under *Mt. Healthy,* and our cases applying *Mt. Healthy* in the Title VII context, BLS bears not a burden of production but a burden of persuasion. Unless the district court concludes that Westbrook's sexual bias had no relation whatsoever to his employment decision, BLS must establish by a preponderance of the evidence that it would have made the same decision in the absence of the illegal factor.[10]

Our careful scrutiny of the record reveals only one possible legitimate, nondiscriminatory reason for Westbrook's imposition of the pulling and loading functions on Bell: structural changes in the washroom that may have reduced BLS's need for washmen from two to one. These changes in equipment may have meant that BLS needed only one person to "fill in" for the absent washman on occasion, and for this reason posted the "extra washman" position with the intent that the occupant of the job pull and load in addition to wash.[11]

However, the record evidence on this point is far from clear, to say the least. The district court, in order to credit BLS' explanation, must find as fact that the changes adverted to took place *prior* to July 12, 1977, the date the extra washman position was posted.[12] To reiterate, given the evidence of direct discrimination, BLS bears the full burden of persuasion on this point.[13] Unless the court finds that BLS established this by a preponderance of the evidence, it must enter judgment for Bell and grant appropriate relief.

**9.** In *Whiting v. Jackson State Univ.,* 616 F.2d 116, 121 (5th Cir.1980), the former Fifth Circuit held "Title VII is not violated simply because an impermissible factor plays *some* part in the employer's decision. The forbidden taint need not be the sole basis for the action to warrant relief, but it must be a significant factor." (Emphasis in original.) Subsequently, this court has emphasized that this principle is "an extremely limited one: An insignificant [illegal] factor does not warrant relief, but significant reliance on an impermissible factor is a violation." *Lee,* 684 F.2d at 775 (citing *Mt. Healthy v. Doyle,* 429 U.S. at 287, 97 S.Ct. at 576).

The difficulty of proving discriminatory intent is well-known and, as indicated *supra* at 1556–1557, is an integral part of the rationale for the structure of the *McDonnell Douglas* analysis. Proof of significant reliance on discrimination as a basis for an employment decision, therefore, establishes a violation of Title VII.

This court has recently acknowledged the substantial criticism of the "but for" standard of causation in disparate treatment cases. *Lincoln v. Board of Regents,* 697 F.2d at 938 n. 12. *See* Brodin, *The Standard of Causation in the Mixed Motive Title VII Action: A Social Policy Perspective,* 82 Colum.L.Rev. 292, 311–26 (1982). We acknowledge the practical difficulties presented to a trier-of-fact required to determine what would have occurred if the discrimination had not existed and not operated as a motivating factor. *Id.* at 320–21. Since the district court did not make findings concerning the causal relationship, if any, between the bias it found to exist and the action taken, it is unclear whether this case presents a "mixed motive" situation. We therefore have no occasion to reach the question of any possible modification of the *Mt. Healthy* standard in the Title VII context.

**10.** If the district court finds that Westbrook's bias played no role in his decision, it should clearly articulate the basis for its finding. This is necessary in light of the nature of the statement the court found that Westbrook had made and the highly probative character of testimony concerning direct decision-maker bias.

**11.** The arbitrator's findings that BLS combined job functions in violation of the collective bargaining agreement tends to support this view; we do not doubt that the realities of industrial life do not always conform to the precise categories of the collective bargaining agreement. However, the arbitrator also found that BLS discriminated against Bell on the basis of her sex.

**12.** The most probative evidence in the record on this point, the testimony of washroom supervisor Farmer, indicates that the changes occurred *after* his retirement in September 1977. The evidence, however, was disputed, the parties did not focus on this question clearly, and the district court made no findings in this regard.

**13.** This seems particularly appropriate in this case since BLS clearly has greater access to proof of these facts than does Bell.

In making this finding, the district court should consider, inter alia, (1) the changing factual positions BLS has taken in the arbitration, EEOC, and judicial proceedings; (2) the evidence of the distribution of BLS' work force by sex among the various jobs in the plant, *see McDonnell Douglas,* 411 U.S. at 804–05, 93 S.Ct. at 1825; (3) BLS' breach of its collective bargaining agreement as it may or may not reflect on its motivation, *see Loeb v. Textron,* 600 F.2d at 1012 n. 6 (the more questionable the employer's reason, the more likely the reason is merely a pretext); and (4) the failure, if any, of BLS to follow objective standards in making its employment decision in this case, *Harris v. Birmingham Board of Education,* 712 F.2d 1377 at 1382, 1384 (11th Cir. Aug. 22, 1983); *Watson v. National Linen Service,* 686 F.2d 877, 881 (11th Cir.1982).

The judgment of the district court is VACATED and the case is REMANDED for further proceedings consistent with this opinion.