**EQUAL EMPLOYMENT OPPORTUNI-**
**TY COMMISSION, Plaintiff–Appellant,**
**Cross–Appellee,**

v.

**BEVERAGE CANNERS, INC.,**
**Defendant–Appellee,**
**Cross–Appellant.**

No. 88–5169.

United States Court of Appeals,
Eleventh Circuit.

April 2, 1990.

**1068**

John F. Suhre, Washington, D.C., for plaintiff-appellant, cross-appellee.

Samuel L. Bare, III, Miami, Fla., for defendant-appellee, cross-appellant.

Before TJOFLAT, Chief Judge, JOHNSON, Circuit Judge, and BROWN,[1] Senior Circuit Judge.

JOHN R. BROWN, Senior Circuit Judge:

The Equal Employment Opportunity Commission (EEOC or the Commission) brought suit against Beverage Canners, Inc. (the Company) for violation of section 703(a)(1) of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e–2(a)(1)[2] on behalf of Tina Wilson. The case was tried to the bench by Judge Aronovitz of the Southern District of Florida. The facts gave rise to a disparate impact case under Title VII. Emil Windholtz was plant manager for the Company and had lay-off and hiring authority. He and Bennett Achins, a supervisor at the plant, frequently made flagrant, revolting, and insulting racially derogatory remarks towards and in the presence of blacks. After finding direct evidence of discrimination, the trial court issued a permanent injunction against the Company from which it appeals. The Company was enjoined from maintaining terms and conditions of employment that discriminate on the basis of race or that create a racially abusive or hostile atmosphere of employment, which we affirm. The trial court, however, denied Ms. Wilson relief. As to her claims, it found, as a matter of law, that the Company had not violated Title VII. We reverse this ruling and hold that the EEOC proved Ms. Wilson was discriminated against. We remand for a determination of the appropriate relief.

### I. The Facts Reveal A Racially Hostile Environment

Regarding the issue of racial hostility in the work place, the trial court found that Windholtz and one of the plant supervisors frequently made racially derogatory remarks. Because they are so flagrant, revolting, and inflammatory, and reflect—better than anything we could say—the deplorable atmosphere of open, hostile, and racially motivated discrimination, we set them out below.[3] Moreover, these racially hostile remarks were made, with the obvious though unthinking purpose to demean them, in the presence of and about black employees. They were, the judge stated, so "commonplace, overt and denigrating that they created an atmosphere charged with racial hostility." The Court concluded that racial harassment at the Company was sufficiently severe and pervasive that it

---

1. Honorable John R. Brown, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

2. The relevant portion of Title VII states:
   "(a) It shall be an unlawful employment practice for an employer—
   (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a).

3. Windholtz used such language as: "niggers," "ignorant niggers," and "swahilis." The record also shows that Windholtz said "blacks were meant to be slaves" and were of lower intelligence. He proclaimed that "[t]hose niggers out there will not get anywhere in this company."

created an abusive work environment for blacks in clear violation of § 703 of Title VII. The Company's management had knowledge of these activities and this environment. The Court enjoined the Company from maintaining a work place with a racially hostile environment.

## II. Employment Hopes "Crushed"

Tina Wilson, a black female, was hired in February 1983. She worked in the Company's plant as a machine operator producing one-liter plastic bottles used to contain soft drinks. On April 22, 1983, Tina Wilson and a white machine operator, Susan Gillespie, were laid off because of a surplus inventory of plastic containers. The layoff was ordered by Windholtz. At the same time Donald Hartwell, a white male machine operator, was transferred to a different job at another of the Company's plants.

The supervisors of both Wilson and Gillespie testified that Windholtz told them that the layoffs were temporary and that both employees would be called back when production resumed. Windholtz, John Shurman, the President of the Company, and John Slocum, Executive Vice-President, however, all testified that the Company did not have a policy or practice of recalling laid off employees. The Company hired by placing signs outside the office, employing walkins, placing newspaper advertisements, or by using temporary placement services. According to Slocum, laid off employees were not barred from their jobs, but they did need to reapply.

Both of the white employees (Hartwell who had been transferred to another division, and Gillespie, who had been laid off) ultimately returned to the plant. Hartwell was transferred back to the plant two weeks after the layoff. It is unclear precisely when Gillespie was rehired. When the line that Hartwell, Gillespie, and Wilson had worked on returned to full capacity, another employee, a white female, was hired to fill Wilson's former job. The trial court found that Wilson, along with Gillespie, had been laid off but that in the context of the Company's employment policies, being laid off was equivalent to being fired or terminated because there was no policy of recalling former employees. The judge also determined that there was no entitlement to be called back to work and that Wilson had never been told by anyone with authority to set labor policy that she would be recalled to work.

The court concluded that because Wilson presented direct evidence of discrimination, the Company had the burden of proving by a preponderance of the evidence that it would have decided not to rehire Wilson even in the absence of any discriminatory motive. The court held that this burden was met on the simple ground that the Company did not have a "recall" policy. This finding was based on the theory that the Company fired (laid off) and then "rehired" former employees and did not "recall" them.[4] The court held that a recall policy was a necessary precondition in this case for Title VII protection to apply because of the "terms, conditions, or privileges of employment" language in the statute.[5] Thus the court held that "because the defendant had no policy or practice of recalling employees who were previously let go, the defendant has demonstrated by a preponderance of the evidence that Tina Wilson would not have been recalled even if she were white."

The EEOC appeals the determination that Wilson was not racially discriminated against and supports the trial court's decision that the work place was racially hostile. The Company appeals the injunction and the determination that the work place

---

**4.** The distinction drawn by the Company and adopted by the trial court between "recall" and "rehire" is at most legal fiction. We do not adopt this fiction. During oral argument, the Company acknowledged that the issue as pleaded at trial and now urged upon appeal includes both "rehire" and "recall." The issue is one of discrimination in employment decisions. In addition, the Federal Rules of Civil Procedure require only that fair notice of the nature of the claim be given in the pleadings and was designed to avoid technical pleading. Therefore, the legal analysis was in error. See 5 C. Wright & A. Miller, Federal Practice And Procedure §§ 1202, 1215 (1969 & Supp.1989).

**5.** See note 2, supra.

was racially hostile and supports the decision that Tina Wilson was not discriminated against.

### III. We Won't Allow A Racially Hostile Environment

The trial court's permanent injunction ordered the Company to refrain from maintaining terms and conditions of employment that discriminate on the basis of race or create a racially abusive or hostile atmosphere of employment.

A factual determination of a trial court can only be set aside if it is "clearly erroneous." *Lincoln v. Board of Regents of University System*, 697 F.2d 928, 939 (11th Cir.), *cert. denied*, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983); *see* F.R.Civ.P. 52(a).

■ The Company contests the trial court's factual findings on the ground that not all racial slurs rise to the level of Title VII violations. The Company stresses the Eighth Circuit's requirement that there be a steady barrage of denigrating racial comments, as distinguished from offensive terms limited to casual conversation among employees, before such slurs rise to the level of a Title VII violation. *Johnson v. Bunny Bread Co.*, 646 F.2d 1250 (8th Cir. 1981).

This was no *Bunny Bread* situation where the court found that the use of racial terms was infrequent, limited to casual conversation, and not directed at black co-workers. *Bunny Bread* was poles apart from *Beverage Canners*. Here the trial court found that racist remarks were frequent, not part of casual conversation and were made to or about black employees. Additionally, the comments were made by the plant manager, not just co-workers. The trial court simply had to find that the racially derogatory remarks were "commonplace, overt and denigrating" and so pervasive and shocking in this more enlightened day that they "altered the con-

ditions of employment and created an abusive working environment for blacks."[6]

The Company, ignoring the fact-finding role of the trial judge, stresses the contrary testimony of management personnel that they knew of no discriminatory conduct and that no such conduct was ever brought to their attention by way of employee complaints. How simple would be race discrimination cases if, as the Company argues, it cannot be held responsible for the remarks of its employees.

Despite this testimony, the court found that management was informed about events at the plant. This included testimony, some conflicting, that management was informed on several occasions about the racial hostility at the plant.

The trial court, whose role, not ours, was to determine facts, had the advantage of observing all the witnesses to make credibility determinations. It is " 'our duty to decide whether the district court could have entered the order that it did.' " *Harris v. Amoco Production Co.*, 768 F.2d 669, 684 (5th Cir.1985), *cert. denied*, 475 U.S. 1011, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1986), *quoting, Brown v. Arlen Management Corp.*, 663 F.2d 575, 580 (5th Cir.1981) (citations omitted).

We uphold the trial court's findings that "the numerous racial epithets were not made sporadically, accidentally, or as part of casual conversation" and that management was informed but did nothing to correct the situation. The finding of a racially hostile environment was not clearly erroneous and the injunction at the hands of EEOC was fully justified.

### IV. "Classic" Discrimination

■ The trial court, *citing, Hishon v. King & Spalding*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), held that since the Company did not have a policy or practice of recalling laid off employees, the right to be rehired was not a "term, condition, or privilege" of employment. Thus,

---

6. Windholtz, referring to the Company's black warehouse manager, complained that "he had to go over and teach that stupid f＿＿ nigger how to count...." The record is replete with evidence of similar comments. There was testimony that such comments and incidents occurred "daily."

he held that the failure to rehire was not subject to Title VII scrutiny. In the trial court's view, the lack of a "recall" policy or practice in effect provided the Company with an absolute defense against what EEOC argued and the trial court explicitly found was discrimination.

Title VII applies to the hiring of employees, regardless of whether an employee recall policy exists.[7] It is irrelevant whether the hiring is for the first time or the second time, pursuant to a recall policy or independent of such a policy. Title VII applies equally to those with an existing employment relationship (on-the-job discrimination), those with a past employment relationship (laying-off and refusing to rehire pursuant to a rehiring plan) and those with no employment relationship at all (refusal to hire a new employee or a laid off employee with no right or expectation of being rehired). *Hishon v. King & Spalding,* 467 U.S. at 74 n. 5, 104 S.Ct. at 2233 n. 5, 81 L.Ed.2d at 66 n. 5 (Title VII is relevant even "in the absence of an existing employment relationship, as where an employer *refuses* to hire someone.") (Emphasis in original). Discrimination in *hiring* does not concern the "terms, conditions, or privileges of employment ..." which was the focus of *Hishon, Id.,* thus the absence of a recall policy is irrelevant to our decision.

Wilson, as a former employee with no right to be rehired before other applicants, merits the same protection in the hiring process as a prospective employee with no prior employment with the Company. To grant Wilson *no* Title VII protection because she had no right to be rehired misstates the law. The only issue is whether Ms. Wilson was denied employment because of her race.[8]

This is a case of alleged disparate treatment. In such cases, if the plaintiff attempts to prove her claim through *circumstantial* evidence, then the analytical framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) is applicable. *Bell v. Birmingham Linen Service,* 715 F.2d 1552, 1556 (11th Cir.1983), *cert. denied,* 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984).

Where, however, there is *direct* evidence of discrimination,[9] as in this case, the *McDonnell Douglas* analysis is inapplicable. *Wilson v. City of Aliceville,* 779 F.2d 631, 634 (11th Cir.1986) (hereafter *Aliceville*).[10] A defendant presented with direct evidence of discrimination in violation of Title VII can only successfully defend by showing by a preponderance of the evidence that the same decision would have been reached even without the discriminatory factor. *Aliceville* at 634 (citations omitted).[11]

The *Aliceville* case is very similar to this one although it was decided on purely evidentiary grounds. In *Aliceville* a racial

---

**7.** Title VII prohibits the failure to hire or the discharge of an employee on racially discriminatory grounds. 42 U.S.C. § 2000e–2(a)(1); *See* note 2, *supra.*

**8.** *See* note 2, *supra.* (That issue is expressly covered by Title VII in the language: "to fail or refuse to hire or discharge any individual ... because of such individual's race ...").

**9.** Discriminatory motive may be proved by direct evidence of the hiring authority's racially discriminatory attitudes, regardless of whether it relates to the employment decision at issue. *Thompkins v. Morris Brown College,* 752 F.2d 558, 561, 563 & n. 11 (11th Cir.1985); *Lee v. Russell County Board of Education,* 684 F.2d 769, 775 (11th Cir.1982). The record discloses that Windholtz had the authority, and in fact did hire, machine operators. In fact, when Ms. Wilson spoke to Slocum, the Executive Vice–President, about coming back to work, Slocum

indicated that Windholtz had already spoken to him and there was nothing Slocum could do because Windholtz was in charge of the plant.

**10.** *See also, Miles v. M.N.C. Corp.,* 750 F.2d 867, 875 (11th Cir.1985); *Bell v. Birmingham Linen Service,* 715 F.2d 1552, 1557 (11th Cir.1983); *Lee v. Russell County Board of Education,* 684 F.2d 769, 774 (11th Cir.1982); *Ramirez v. Sloss,* 615 F.2d 163, 168 & n. 9 (5th Cir.1980).

**11.** This framework is derived from *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471, 484 (1977). *See, e.g., Miles v. M.N.C. Corp.,* 750 F.2d 867, 875–76 (11th Cir.1985); *Bell v. Birmingham Linen Service,* 715 F.2d 1552, 1557 (11th Cir.1983); *Lee v. Russell County Board of Education,* 684 F.2d 769, 774 (11th Cir.1982).

slur was made by a person in charge of making employee evaluations and suggestions for rehiring. In our case, Blacks were so subjected to racially hostile remarks by managers and supervisors that the trial court found the atmosphere to be "charged with racial hostility." The facts of our case far exceed those in *Aliceville.* We have consistently found similar sets of facts to be direct evidence of discrimination. *See Miles v. M.N.C. Corp.*, 750 F.2d 867, 873–76 (11th Cir.1985); *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1557 (11th Cir.1983).

It bears repeating: the trial court found a "racially hostile" environment; management was aware of the racial hostility; the discriminatory conduct was that of managers who were responsible for employment decisions. It enjoined these practices. This overwhelming evidence of racial hostility constitutes direct evidence of discriminatory intent in management decisions. The Company presented no evidence that it had put aside the illegal activities and motive. Instead, it continues to deny the existence of racial hostility. Accepting the trial court's findings of fact and applying the direct evidence framework, we conclude that EEOC proved that Tina Wilson was discriminated against.

### V. Discrimination "Un"done: Title VII Revisited

The presence or absence of a "recall" policy does not legally defeat a direct evidence claim of discrimination in violation of Title VII. The Company had the final burden of proof, by a preponderance of the evidence standard, to prove that the illegal motive of discrimination had been set aside in its employment decision. It failed to meet this burden of proof. Therefore, the decision of the trial court in regard to Ms.

Wilson must be reversed. We remand the case for a determination of the relief Ms. Wilson is entitled to including back pay,[12] and, if appropriate, front pay and attorney fees, as prayed for by EEOC.

We uphold the trial court's injunction against the Company. As the first Justice Harlan stated in his dissent in the *Civil Rights Cases,*[13] "there cannot be in this Republic, any class of human beings in practical subjection to another class,.... The supreme law of the land has decreed that no authority shall be exercised in this country upon the basis of discrimination, in respect of civil rights, against freemen and citizens because of their race, color, or previous condition of servitude. To that decree ... everyone must bow...." [14]

AFFIRMED in part,

REVERSED and REMANDED in part.

---

**12.** The trial judge did not make any specific factual finding as to precisely when Ms. Wilson reapplied for her job at the Company. Ms. Wilson testified that she initiated contact after she heard that Gillespie was back at work. Williams (Wilson's supervisor), Windholtz, and Slocum all acknowledge that they were contacted by Ms. Wilson, but give conflicting testimony as to when that contact occurred. We find that Wilson did reapply for her position and is thus

eligible for back pay. Back pay should be calculated from the time when the line went back to full capacity or thereafter when Wilson reapplied.

**13.** 109 U.S. 3, 62, 3 S.Ct. 18, 57, 27 L.Ed. 835, 856–57 (1883).

