**Kenneth Alan SIMKIN, Plaintiff,**

v.

**Barbara Anne NORCROSS, Defendant.**

**No. 85–177–CIV–EPS.**

United States District Court,
S.D. Florida,
Miami Division.

May 23, 1985.

Kenneth Alan Simkin, pro se.

Gene Brown, Marathon, Fla., for defendant.

## MEMORANDUM OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

SPELLMAN, District Judge.

The Plaintiff, Kenneth Alan Simkin, and the Defendant, Barbara Anne Norcross, both claim title to the thirty foot Morgan Sailing Vessel "SHEMARA," Florida Registration Number FL8839CG. The "SHEMARA" is currently residing with the Defendant in Key Colony Beach, Florida. The Plaintiff, however, believes that he should have custody of the "SHEMARA." Thus, on January 29, 1985, he instituted this action to have the "SHEMARA" awarded to him. This is his story.[1]

### I

Lured by the South Florida sunshine and promise of adventure, Ken Simkin, a British citizen, embarked on a fortnight holiday in Marathon, Florida in December, 1982.[2] Although, as in the best of melodramas, Simkin is living in reduced circumstances now, he was, in 1982, a man of not inconsiderable means. In December, he was sojourning, along with his brother, at the Ruttger's Ocean Beach Club in Key Colony Beach, Florida.

An affable fellow, Simkin soon met Susan Taute, the wife of a Marathon fishing boat captain. Mrs. Taute introduced Simkin to Judy Szpak.

Szpak introduced Simkin to her thirty foot Morgan sailing vessel. "You like her, don't you?" Szpak must have asked. "She is a fine vessel. And for only thirty

---

**1.** On April 11–12, 1985, this Court presided over a non-jury trial. The unusual story that follows constitutes this Court's findings of fact.

Because of the parties' candid and intimately detailed testimony, this Court has endeavored to share and celebrate their fascinating lives. Although some liberty has been taken in assembling the facts and circumstances of their case into this unusual narrative, this Court does not mean to embarrass or offend anyone. This Court does hope that some are entertained by this Memorandum Opinion. But this Court's purpose is not entertainment. In this case, as in all others, this Court has attempted to do justice within the confines of the law.

**2.** Simkin had vacationed in South Florida in September, 1982 as well. Then, an alleged "robbery" separated Simkin from his passport and "air ticket to England." One reason for his return in December was to claim his possessions from the Key West police.

four thousand ($34,000.00) dollars, I'll let you have her!"

Impetuously, Simkin accepted the offer. He gave Szpak one thousand ($1,000.00) dollars as a good faith deposit and christened his vessel "SHEMARA."

Still excited over his recent acquisition, Simkin met the Defendant, Barbara Norcross, on December 30, 1982. Known at the time as Barbara Vaughan, Norcross was employed as a hostess at Sinbad's Restaurant in Key Colony Beach. The two met at Sinbad's.

Norcross was a capable hostess. Her cheery presence not only charmed the patrons but seemingly implied to all that the fare at Sinbad's was delicious.

Although Simkin personally did not care for the fare, he was frequently found at Sinbad's. It was there that he met Laura Macklin. Laura's husband, Richard, held the lease on Sinbad's and supervised its hostess Barbara Anne Norcross.

Laura Macklin, no doubt aware that Simkin had recently purchased the Morgan sloop, attempted to interest Simkin in her fifty-seven foot Carrier Craft houseboat. Showing Simkin a photograph of the houseboat, the "AMORE DE LA VITA," Macklin must have inquired, "You like her, don't you?"

Simkin's facial expression—a naive and brooding fascination—obviously prompted Macklin to continue.

"She is a fine vessel," celebrated Macklin. "And for only seventy-seven thousand ($77,000.00) dollars, I'll let you have her!"

Before considering Macklin's offer, Simkin decided to venture to Fort Lauderdale to inspect the "AMORE DE LA VITA." Macklin provided Simkin with the necessary directions to Pier 66, but, unfortunately, Simkin could not locate the vessel. He returned to Marathon, a disappointed man.

Simkin spent New Year's Day with his new friend, Barbara Norcross. He told her of his recent purchase and described the "SHEMARA" to her. He told her that he was also interested in acquiring the Macklin's houseboat. He introduced Norcross to his brother. The following day, however, Simkin returned, with his brother, to England.

Nevertheless, despite the paucity of time spent in Ken Simkin's company, Barbara Norcross testified on direct examination that she was, at this time, "falling in love with Ken."

On February 10, 1983, Simkin was back again in South Florida. After meeting Simkin at the Marathon Airport, Norcross accompanied him to Fort Lauderdale. Obviously aided by better directions, the two had no trouble locating either Pier 66 or the "AMORE DE LA VITA." They met the Macklins and several other guests on board the houseboat.

Housed in separate berths, Ken and Barbara spent the night on the "AMORE DE LA VITA." Although Barbara testified that she was embarrassed by these sleeping arrangements, they were both in good spirits at the time. They slept peacefully, unaware that on the following day their lives would undergo a sudden and dramatic change.

As the first gray streaks of a new dawn filtered tenuously above Fort Lauderdale, the boating party embarked on their two day voyage to Key Colony Beach. At dusk, they docked at Gilbert's Marina and Restaurant for an evening of merriment. Both Simkin and Norcross admitted that they were "very drunk."

Upon returning to the "AMORE DE LA VITA," our friends found that the commodious master stateroom, previously occupied by the Macklins, was now, mysteriously, being made available for them. At the thought, Simkin's normally ruddy complexion began to pale. Lamely, he lodged his protest. "As all on board appear to be respectfully married," he explained, "proprieties should be observed."

Laura Macklin, a notary public by trade, shrewdly solved the dilemma. In a "midnight marriage ceremony," complete with a paper cigar band as a ring, she pronounced Ken and Barbara "husband and wife."

After a brief honeymoon, Simkin returned, on February 16, 1983, to his home in Liverpool, England. His new-found bride and the Macklins arrived several weeks later, ostensibly to meet Simkin's family and friends and for, in Barbara Norcross' words, "a real marriage ceremony."

Kenneth Simkin had, by this time in his confused personal life, completed payment on the thirty foot Morgan sailing vessel "SHEMARA." Thus, on February 25, 1983, Judy Szpak, the Registered Owner, transfered title to Simkin.

Meanwhile, Simkin and his guests spent Easter that year traveling through much of Great Britain and Europe. London, England, Dublin, Ireland and Paris, France were among the many ports of call. Barbie, Ken's latest nickname for his wife, described this vacation as "a whirlwind tour." During the tour, Barbie was overjoyed and found herself often dreaming of the perfect life she would share with Ken.

Barbie's perfect future did not come true. She found her dreams being shattered as quickly as they had grown. Although Ken introduced Barbie to all as his "wife," he did not, as promised, arrange for "a real marriage ceremony." And the abrupt and atrocious manner in which Ken "tossed" the engagement ring, valued at five thousand ($5,000.00) dollars, onto Barbie's unsuspecting lap while in his car, was, as Barbie testified "not appreciated."

"It was then that I began to realize," Barbie woefully continued, "that he was not the man I married!"

After Easter, the Macklins returned to the states. Barbara Norcross, known at this time as Barbara Simkin, stayed on in Liverpool with Ken. In May, 1983, she too returned to South Florida. She lived on the "AMORE DE LA VITA," which Simkin impulsively agreed to purchase from Laura Macklin for seventy-seven thousand ($77,000.00) dollars. Simkin, his funds seriously depleted, remained in Liverpool. He attempted to sell his home.

Unsuccessful in his efforts, Simkin finally joined Norcross in Marathon in June, 1983. Laura Macklin had prompted the visit. Although Simkin had given Macklin over forty-six thousand ($46,000.00) dollars towards the purchase price of the houseboat, Macklin was anxious to complete the sale.

Simkin, however, could not come up with the balance of the purchase price. It was therefore decided that Macklin would have the houseboat painted and then sold, optimistically, for one hundred five thousand ($105,000.00) dollars. Laura Macklin would then divide the profits with Simkin.

Out of Simkin's share of the profits was to be deducted seven thousand eight hundred ($7,800.00) dollars—the asking price for the Macklin's 1979 Cadillac Eldorado. Norcross begged Simkin to purchase the car for her exclusive use. Simkin agreed to this arrangement and then returned to England.

While Simkin was in England, Norcross, with Simkin's money and permission, founded United Kingdoms Ltd., a window washing, maid service and catering business. Although doing very well initially, the business was irreparably damaged after the business records were stolen in October, 1983. The perpetrators were alleged to be Norcross' friends and employees. They were never apprehended by the police.

In November, 1983, Simkin was again back in Marathon. Norcross was living in a rented home in Key Colony Beach and working as a chef in the newly-opened Candlelight Restaurant (formerly Sinbad's). Simkin moved in with Norcross although they once again slept in separate bedrooms.

Despite these less than ideal living arrangements, Norcross' career flourished. She was, if anything, overly qualified to be a chef. Norcross also enjoyed her new position at the Candlelight.

Few assets coupled with enormous liabilities convinced Simkin to close United Kingdoms Ltd. He instead opened a joint bank account with the last of his money—seven thousand ($7,000.00) dollars. Within one week, Norcross withdrew six thousand

($6,000.00) dollars. It was then that Simkin sadly realized his wife coveted money with the same ferocious intensity she hungered after new recipes. He decided to salvage the remaining one thousand ($1,000.00) dollars before he had nothing left.

In January, 1984, after her successful stint at the Candlelight, Norcross began working at Kelsey's Pancho Villa Restaurant in Marathon, Florida. She became Kelsey's executive chef. She also became increasingly despondent about her marriage. While she encouragingly prepared food for Marathon, Simkin, ironically, sold weight loss products.

In April, 1984, Norcross suffered a serious fall in the kitchen of Pancho Villa's and spent several weeks in traction at Fisherman's Hospital. In June, 1984, she was convinced that her ailing marriage could not likewise be healed. She thus had Simkin meet her at her Attorney, Frank Greenman's office. In that office, Simkin was informed that his wife, Mrs. Simkin, wanted a divorce.

Angered by the news, Simkin found he could not face his once beloved, Barbie. To avoid a seething confrontation, he stormed out of the attorney's office. At Norcross' rented home, he packed some of his belongings and prepared to leave Marathon in the "SHEMARA." Norcross attempted to thwart Simkin's departure by dismantling the electrical wiring in the "SHEMARA." She was unable to do so.

It was late afternoon when Simkin set sail for Fort Lauderdale. Dusk, like an anodyne to the recent disagreement, was settling over Marathon. Soon, the night would come, with sleep and, for a while, forgetfulness. But now, Simkin felt a genuine regret and a sorrow over his failed marriage. He also must have wondered if he would ever be wise about women.

On November 26, 1984, Florida Circuit Judge David P. Kirwan found that the marriage of the Simkins was "irretrievably broken," and thus entered a Final Judgment of Dissolution of Marriage.

Having felt safe in Fort Lauderdale, it was not until December, 1984 that Simkin ventured back to Marathon. Simkin knew that his ex-wife was in New York at the time. Still, this visit proved to be a mistake.

With the permission of the owner, Simkin docked the "SHEMARA" at the Buccaneer Resort and Marina in Marathon. The vessel was tied to a jetty and in good condition. However, when Simkin attempted to retrieve his vessel, it was gone.

## II

Thus, Simkin has instituted this action to retrieve his vessel.[3] And even though Norcross tells a different story, this Court believes and is impressed by Simkin's version.

■ Norcross first argued, at the pre-trial conference on March 28, 1985, that she should be permitted to keep the "SHEMARA" because Simkin abandoned the vessel. In support of this claim, Anne H. Castle testified for Norcross at the non-jury trial. Castle stated that the "SHEMARA" was run aground and in poor condition when she saw it at the Buccanneer. She therefore had Captain Mark Travis move the boat.

This Court chooses not to believe Castle's testimony. Simkin testified that he tied the "SHEMARA" to a jetty and left the vessel in good condition. Based on his testimony, which this Court finds credible, it is clear that Simkin had no intent to and, in fact, did not abandon the vessel.

■ As an additional argument, Norcross testified that the "SHEMARA" was a gift from Simkin. This Court disagrees.

3. At the pre-trial conference on March 28, 1985, Simkin indicated to this Court that he not only demanded that the "SHEMARA" be returned but that the Defendant be ordered to return all of the money she had taken from him and the gifts she had received from him. This Court finds this claim to be without merit. The gifts and the money, this Court finds, were completed gifts from Simkin to Norcross and can not now be set aside.

Aware of the conflict in the testimony presented, the choice to credit some testimony and reject other versions of events is clearly within the province of the trier of fact. *See Nunez v. Superior Oil Co.,* 572 F.2d 1119 (5th Cir.1978). This Court is in the best position to weigh the testimonial evidence since it observed the witnesses and evaluated their credibility. Having evaluated the credibility of the witnesses, this Court chooses to believe Simkin's testimony that the "SHEMARA" was not a gift to Barbara Norcross.

This conclusion is not altered by the Vessel Certificate of Title presented at trial as Defendant's Exhibit 1. Nor is the conclusion affected by the "signed documents authorizing her [Norcross] to deal with the vessel as she pleased." *See* Defendant's Amendment to Answer, filed on April 9, 1985. Although the Certificate of Title lists Barbara A. Simkin as the registered owner, the documentation on file with the Department of Natural Resources indicates that Norcross, to obtain the Title, represented, under oath, that she purchased the vessel from Judy Szpak for five thousand ($5,000.00) dollars. This representation is incorrect. At the non-jury trial, Norcross testified, under oath, that Ken Simkin purchased the vessel from Judy Szpak for thirty four thousand ($34,000.00) dollars.

Norcross' misrepresentation, however, was also unauthorized. This Court considers the Power of Attorney, Defendant's Exhibit 3, to be, as Simkin explained, "a forgery." And Defendant's Exhibit 2, dated June 29, 1983, would not permit Norcross to "deal" with the "SHEMARA" "as she pleased," but only "authorise[d sic]" Norcross "to dispose" of the vessel. Obtaining a certificate of title in one's own name by misrepresenting one's self as the purchaser of the vessel but later claiming to this Court that the vessel was a gift is

not "dispos[ing]" of the vessel. Instead, this Court finds that what Simkin contemplated by the authorization "to dispose" was for Norcross to "sell the boat outright through a Broker." *See* Letter of August 9, 1983, Defendant's Exhibit 4. In that letter, Simkin also cautioned Norcross against any other "scheme you have in mind." Therefore, without commenting on Norcross' improper and unauthorized misrepresentation, this Court is of the opinion that Defendant's Exhibit 1 can be disregarded and Norcross' credibility doubted.

For these reasons, this Court decides that Simkin must be permitted to retrieve the "SHEMARA." [4] This Court is of the opinion that Simkin has suffered enough; it is therefore this Court's desire and ruling that Simkin's story have a happy ending.

---

**4.** Based on this ruling, the United States Marshal is directed to accompany Mr. Simkin to Marathon and insure that he immediately obtain possession of the "SHEMARA" in a peaceful manner.

As a further precautionary matter, the Defendant, Barbara Anne Norcross, the Nominal Defendant, Anne H. Castle and John Clark, the mechanic who performed repairs on the "SHEMARA" for the Defendant Norcross during the pendency of this action, are hereby enjoined from in any way interfering with Simkin's possession and enjoyment of the "SHEMARA."