Mary E. WOODY, Plaintiff–Appellant,

v.

ST. CLAIR COUNTY COMMISSION, James Satterfield, Charles Marcum, Chris Fowler, Paul Manning, James Ingram, each individually and in their capacities as members of the St. Clair County Commission, Wallace Wyatt, individually and in his capacity as Judge of Probate of St. Clair County, Defendants–Appellees.

No. 87–7744.

United States Court of Appeals, Eleventh Circuit.

Oct. 17, 1989.

Dennis G. Pantazis, Gordon, Silberman, Wiggins & Childs, P.C., Birmingham, Ala., for plaintiff-appellant.

William J. Trussell, Billy L. Church, Church, Trussell & Robinson, PC, Pell City, Ala., for defendants-appellees.

Before HATCHETT and CLARK, Circuit Judges, and HOEVELER *, District Judge.

CLARK, Circuit Judge:

In this Title VII case, we review the district court's memorandum opinion which concluded that probate judge Wallace Wyatt did not intentionally discriminate against Ms. Mary Woody on the basis of her race when he made certain hiring decisions. Although the district court did not specifically decide whether Woody had established a *prima facie* case, it reached the ultimate issue of whether Wyatt intentionally discriminated against Woody. Because we find this handling of the case legally permissible, and because we find that the district court's factual findings were not clearly erroneous, we affirm.

### FACTS

Ms. Mary Woody has applied on three separate occasions for various positions within the St. Clair County Probate Office. On each occasion the County Commission processed her application in accordance with standardized employment procedures. These procedures require the Commission to advertise a vacant position with any existing employees for a limited period of time. If no qualified employees apply for the advertised position, the employment notice is forwarded to the State of Alabama Employment Service (AES). AES then advertises the vacancy to the general public. This advertisement includes the specific qualifications needed for the available job. Once applications are received, AES undertakes an initial screening to determine whether an applicant meets the minimum qualifications needed for the particular position. Up to five of the applications that pass this initial qualification process are then forwarded to the employing entity for final screening.

In this case, the employing entity was the St. Clair Probate Office. Within this office, probate judge Wallace Wyatt has the absolute authority to hire and fire his own employees. The County Commission, however, manages the number of employees, insurance, payroll and retirement records within the probate court.

Ms. Mary Woody, a black female, first applied to an AES vacancy advertisement in May of 1984. On this occasion, Woody failed the minimum typing requirements for the position; consequently, AES did not forward her name to Wyatt as a possible candidate. Because she was not hired for this position, Woody filed a complaint against Judge Wyatt with the Equal Employment Opportunity Commission (EEOC) alleging racial discrimination. She later dismissed the suit when she discovered the reason why she had not been hired.

In July of 1984, three positions became available in the St. Clair County Probate Office. The AES advertised two vacancies for the position of advanced clerk and one vacancy for the position of general office worker. The basic requirements for the positions included: (1) five years of office experience; (2) forty-five words per minute net typing skills; and (3) a high school diploma. AES certified a total of thirteen applicants for the three positions. Ms. Woody was one of those applicants.

Because of the large number of applicants referred to him, Judge Wyatt initially met with all thirteen applicants jointly at which time he outlined the job requirements and duties. Following this general meeting, he interviewed each applicant separately. Each interview was conducted in the same manner. Because he already had specific information on each candidate, Judge Wyatt did not ask the applicants specific questions; rather, he allowed them each to tell him general things about themselves that they thought important.

The only variation in this process occurred during Ms. Woody's interview when Wyatt told her he had nothing against black people and that he had, in fact, hired the first black person to work in the St. Clair County Courthouse. As for the substance of the interview, Ms. Woody told the judge about her clerical skills, her qualifi-

* Honorable William M. Hoeveler, U.S. District Judge for the Southern District of Florida, sitting by designation.

cations and her background as a paralegal and administrator. Judge Wyatt eventually filled all three positions with white females. These females all had faster typing skills and more secretarial experience than Woody.

Later that same year, in October 1984, the AES advertised another opening for the position of general office worker. This job primarily required typing automobile registrations. Again, the AES referred Woody and four other applicants to Judge Wyatt for screening. At the interview, Woody again expressed her qualifications in the clerical field and her background in law and administration. This time Judge Wyatt hired Pamela Webb, a white woman, who had previously been employed as a legal secretary. Webb typed seventy-five words per minute as opposed to Woody who typed fifty-four words per minute. Upon learning that she was again not hired, Woody filed a second complaint with the EEOC.

After receiving a right-to-sue letter from the EEOC, Woody brought this complaint against, among others, the County Commission and Judge Wyatt, in federal district court. In her complaint, Woody alleged unlawful hiring practices and disparate treatment because of racial discrimination in violation of 28 U.S.C. §§ 1331, 1343(a)(4), 2201 and 2202; 42 U.S.C. §§ 1981 and 1983 and Title VII of the Civil Rights Act of 1964. The parties completed discovery and the district court conducted a nonjury trial.

During trial, the court heard testimony from Judge Wyatt concerning his reasons for not hiring Woody. Basically, the judge stated that he did not hire Woody because she was not the best-qualified in those areas necessary for the jobs to which she applied. In addition, he stated that Woody was overly-qualified for these jobs in other areas giving the judge the impression that she would not stay on the job for a very long time. The judge further testified that he considered whether the prospective employee would stay on the job to be important because he had continuous problems with turnover in his office as trained employees left for higher paying jobs in neighboring counties. He admitted that he did not question the candidates about their intentions to stay if they were hired. Finally, Judge Wyatt testified that his comment concerning his impartiality to blacks was prompted by his desire to reassure Ms. Woody in light of the fact that she had filed an EEOC lawsuit against him. After hearing testimony, the district court held that the evidence did not support a finding of racial discrimination. The court entered judgment in favor of the appellees and Woody filed this appeal.

## DISCUSSION

On appeal, Woody raises essentially two issues. First, she contends that the district court held that Woody had not established a *prima facie* case of discrimination and, she argues, this holding is erroneous. Second, Woody alleges that the district court clearly erred when it found that Judge Wyatt did not intentionally discriminate against her in rejecting her for employment. The appellees counter that the district court did not specifically find that Woody had failed to establish a *prima facie* case; instead, the court permissibly skipped over that requirement to reach the ultimate issue of intentional discrimination. According to the appellees, even if the district court did decide that Ms. Woody failed to make out a *prima facie* case, this finding should be affirmed because the appellant did not meet her *prima facie* burden of proof. Finally, the appellees contend that because Ms. Woody did not prove intentional discrimination, the district court's finding of no intentional discrimination cannot be clearly erroneous. We address each of these issues in turn.

### A. THE PRIMA FACIE CASE

During the trial of this case, after the close of the plaintiff's evidence, the defendants moved to dismiss the action alleging that the plaintiff had failed to establish a *prima facie* case of discrimina-

tion. The district court denied this motion and the defendants went forward with evidence of nondiscriminatory reasons for Judge Wyatt's decisions not to hire Ms. Woody. At page ten of its memorandum opinion, the district court wrote: "Even had the plaintiff proved a *prima facie* case, her attempt to establish pretext on the part of the defendant has failed." The court went on to discuss the insufficiency of the plaintiff's evidence on the ultimate issue of intentional discrimination.

In *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), the Supreme Court held that when a case is fully tried on the merits, the courts should no longer concern themselves with whether or not the plaintiff had established a prima facie case. "Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." *Id.* 103 S.Ct. at 1482. Instead, both the trial and the appellate courts should proceed directly to the "ultimate" question in the case: whether the defendant intentionally discriminated against the plaintiff. *Id.*

In this case, the district court had before it all of the evidence it needed to decide the ultimate factual issue in this case. After both parties presented all of their evidence to the district court, the question of whether Woody established a *prima facie* case no longer had any practical or legal significance. Thus, it was legally permissible for the district court to avoid any determination of the *prima facie* case and to proceed directly to a discussion of the ultimate issue: whether Wyatt intentionally discriminated against Woody. We likewise turn our immediate attention to the question of intentional discrimination.

## B. INTENTIONAL DISCRIMINATION

The district court's findings of fact in a Title VII case are reviewed under the clear-

ly erroneous standard. *Pullman–Standard v. Swint,* 456 U.S. 273, 287–88, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). In an intentional discrimination case, once a defendant articulates legitimate, nondiscriminatory reasons for an employee's rejection to the trial court, the plaintiff has the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are mere pretext. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Pretext may be proven by direct evidence of discrimination in the form of statements and admissions or by circumstantial evidence in the form of comparative or statistical evidence. *Miles v. M.N.C. Corporation,* 750 F.2d 867, 870 (11th Cir.1985). Woody attempted to use all three types of evidence to refute the appellees' proffered explanations for rejecting her for employment as "unworthy of credence." *See, Burdine,* 101 S.Ct. at 1095.

■ First, Woody offered the judge's remark to her that he had nothing against blacks and had, in fact, hired the first black in the St. Clair County Courthouse, as direct evidence of discrimination. When queried about this statement during trial, Judge Wyatt stated that he was cognizant of the fact that Ms. Woody had earlier filed and then withdrawn an EEOC complaint against him and that he wanted to relieve Woody of any concerns that he might be racially biased. The district court specifically found Wyatt's explanation credible holding that "[r]ather than being an intentional discriminatory racial remark, it was intended to put her at ease." (Memorandum Op. at 4.)

Regardless of any conclusion we might independently reach, we may only reverse the district court if we are convinced that a mistake has been made. *Thompkins v. Morris Brown College,* 752 F.2d 558, 564 n. 14 (11th Cir.1985). No basis exists for

reversing the district court's finding on this point. The district court presided over the trial and heard the testimony of both Woody and Wyatt. The court was in an eminently better position to evaluate the credibility of the witnesses. *See, Thelma C. Raley, Inc. v. Kleppe,* 867 F.2d 1326, 1328 (11th Cir.1989); *Simkin v. Norcross,* 610 F.Supp. 691, 695 (S.D.Fla.1985). In the absence of any other evidence of racial bias on Wyatt's part, the district court was not clearly erroneous in finding that the judge's remark did not manifest an intent to discriminate against Ms. Woody.

■ Second, Woody attempts to establish pretext by offering comparative evidence of her qualifications and those of the women eventually hired. In other words, she alleges that she was just as qualified for the positions as the women who were eventually hired and that any attempt to distinguish their qualifications is subjective and academic.

At trial, Judge Wyatt gave essentially three reasons for not hiring Ms. Woody. First, he stated that he did not think Ms. Woody "was the best qualified for the particular job that I was hiring for." (R–2–97). Second, he stated that Woody was over-qualified for the positions and, third, he felt that because of her qualifications, Woody would leave the job sooner than the hired applicants. Woody claims that the first and second reasons offered by Wyatt are contradictory and that the third criteria is illegitimate and subjective. The district court found Wyatt's explanations valid. The record fully supports the district court's findings and there is no justification for setting them aside as "clearly erroneous."

First, it was not contradictory for Wyatt to believe that Woody was overly qualified for the job in some respects and yet not as well qualified as those hired in other respects. Indeed, the district court's finding on this issue illustrates the interrelation of the judge's two concerns:

Not only did Judge Wyatt consider the plaintiff over-qualified, he was of the opinion that the other applicants had transferable skills which were either equal to or greater than those of the plaintiff whose secretarial skills could only be classified as minimal. The evidence indicates that the typing skills of the other applicants exceeded those of the plaintiff, who had the lowest typing score of the group. While she did have commendable experience and qualifications in other areas, they were not in the areas which were required for the positions she sought.

(Memorandum Op. at 5.) The district court was permitted to determine that Judge Wyatt was neither inconsistent nor untruthful in stating that both of these reasons played a part in his employment decision.

Second, it was not error to find that Wyatt validly rejected Woody because she was over-qualified for the position of general office worker. In her interview, Woody emphasized her paralegal and mediation skills. Neither of these skills had anything to do with typing automobile registration receipts. Wyatt was looking for someone to perform a dull typing job and had the right to assume that Woody had not obtained her paralegal and communications education for the purpose of spending any substantial time at this particular job. Indeed, we judicially note that people are often turned away from employment because they are "over-qualified." Furthermore, it was not inconsistent for Wyatt to believe that Woody was overqualified but that Pamela Webb, the woman he eventually hired, was not, even though Webb had previously been employed as a legal secretary. Judge Wyatt considered a paralegal, but not a legal secretary, to be a professional. In addition, Wyatt felt that a legal secretary's skills were more in accordance with the skills required for the position of a

clerk than were the skills of a paralegal. Judge Wyatt testified as follows:

Q: Now, you mentioned that you thought Ms. Woody was over qualified, and that was part of your reasoning for not hiring her. Wasn't it true that you've hired people over qualified before?

A: Not professional. I've never hired a person that had a profession before, no, sir.

Q: Isn't it true that you hired Pam Webb in 1984 who was a legal secretary?

.       .       .       .       .

A: She had some legal experience in Calhoun County before her husband got transferred away from there, sir.

.       .       .       .       .

Q: Excuse me. Now you've testified that you [sic] had a little or some I think was the exact wording that you said legal experience?

A: I don't remember how much offhand. I mean, you've got it. That's a matter of record, but she had excellent typing skills which were very important at this particular time, and I'd be glad to explain the difference.

(R–2–101–05.) Woody did not clearly establish that her objective qualifications and skills were not a legitimate factor in Wyatt's employment decisions.

Woody's final contention regarding Wyatt's explanations for his employment decisions is equally unavailing. Woody argues that Wyatt's concern that Woody would prematurely leave the available jobs was a subjective and therefore illegitimate criteria. Wyatt gave the following testimony:

Q. And you never asked her where she planned to live in the future in October of 1984; isn't that correct?

A. That's true. That's true.

Q. So, you don't—never asked her any questions in regard to whether or not she would stay or be a stable employee, did you?

A. I didn't ask either one of them any.

Q. You determined—

A. But by her being a professional paralegal, the natural thing would be for her to get a job, and that takes at least two years' training as probate clerk, and that's the biggest problem I've had is keeping employees, and I was doing my dead level best.

Q. You did determine on your own without any inquiry into Ms. Woody or as to Ms. Woody that she would not stay in the job because she would bet bored, did you not?

A. I determined that on my own, yes, sir, just like—

Q. Did you ever question her about that?

A. No.

(R–2–117–18.) While Wyatt's evaluation of the candidates as to how long they would stay on the job was subjective, it was not pretextual. There is no doubt that Wyatt was frustrated by the constant turnover in his office. (All four persons employed for the positions at issue in this case had left the job by August 1987). Wyatt should have discussed the potential of staying on the job with each applicant if he planned to use this factor in his employment decision; however, the district court was within its province in finding that this explanation was not evidence of pretext. The district court found that Wyatt's concern about remaining on the job was legitimate and that he used objective indicators in considering whether an applicant was likely to remain:

Even had the judge probed the backgrounds of other applicants, his decisions concerning filling the positions were not based on the marital status of the applicants. He did consider whether the prospective employee would remain with the job were she hired, but more importantly whether the prospective employee's job skills were relevant to the position she sought. He did not consider Ms. Woody's skills transferrable to his office, and judging from her history of frequently changing jobs, plus his opinion that she was over-qualified for the job, he was of the opinion that she would not remain with the probate office. His concern with the continuity and efficient

functioning of his office staff cannot be considered racial discrimination and are certainly legitimate interests. (Memorandum Op. at 7–8.) Furthermore, even if this particular criteria is subjective, as discussed above, Wyatt produced other legitimate factors that swayed his employment decision—factors that Woody did not sufficiently refute. "[B]ased on the entire record, we [are not] left with a definite and firm conviction that a mistake had been made." *Thompkins*, 752 F.2d at 564 n. 14. According to *Burdine*, 101 S.Ct. at 1094, Judge Wyatt's burden of production consisted of clearly setting forth a legally sufficient explanation for Woody's rejection that would justify judgment in his favor. *Id.* at 1094. Wyatt met his burden. Moreover, insofar as this subjective factor might bear on the credibility of Wyatt's other articulated reasons for not hiring Woody, it is the district court who must decide whether, on the whole, the proffered explanations are "unworthy of credence." *Id.* at 1095. The district court was not clearly erroneous in its determination.[1]

## CONCLUSION

The district court did not rule on whether the appellant established a *prima facie* case. Because the court denied the appellees' motion for a dismissal, however, and ruled on the ultimate issue of discrimination in this case, we need not address whether a *prima facie* case had, in fact, been established. Furthermore, after a thorough review of the record, we do not find that the district court erred in its ultimate disposition of the case. The district court order is therefore

AFFIRMED.

---

1. As final evidence of discrimination, Woody offered statistical evidence. We fully agree with the district court regarding this evidence:

    The statistical evidence introduced by the plaintiff does nothing to strengthen her case. It shows that during the period 1980–1984, 89 percent of the applicants in the probate office were white and 11 percent were black. No indication or consideration is made for the existing black/white ratio employed there prior to and during that time period. Other evidence in the record, not disputed by the plaintiff, shows that St. Clair County has a ten percent black population. Ten percent of the employees within the probate office are black.

HATCHETT, Circuit Judge, dissenting:

I dissent because the majority's conclusions ignore relevant evidence which conflicts with Judge Wyatt's proffered reasons for not hiring Woody. Judge Wyatt testified at an EEOC hearing and in a deposition that he refused to hire Woody because she was over-qualified. Conversely, Judge Wyatt testified at trial that he refused to hire Woody because she was not the best qualified for the particular job, that her typing speed was not as high as the other applicants, and that her professional training would have created disinterest in the position. As the majority notes, an Alabama agency had the responsibility to determine qualifications.

In October, 1984, the AES advertised another position for general clerk. This job primarily consisted of typing automobile registration lists. The district court and Judge Wyatt characterized this position as tedious, time consuming, and monotonous. Woody and four other applicants applied for the position. Again, Woody advised Judge Wyatt of her clerical qualifications, and her paralegal and administrative skills—the same qualifications on which Judge Wyatt based his opinion that Woody was over-qualified when she had applied in July. Judge Wyatt subsequently hired Pamela Webb, a white female, finding that Webb was better qualified for the position. Webb typed seventy-five words per minute; Woody typed fifty-four. Although Judge Wyatt believed Woody's "profession" as a paralegal rendered her over-qualified, he nonetheless hired Webb, a legal secretary, who was clearly over-qualified for the position.[1] If Judge Wyatt believed that

These statistics do not establish a pattern of favoring whites over blacks in a disproportionate manner.
(Memorandum Op. at 10.)

---

1. When questioned at trial on this matter, Judge Wyatt proffered the following explanations:

    Q. Now, you mentioned that you thought Ms. Woody was over-qualified, and that was part of your reasoning for not hiring her. Wasn't it true that you've hired people over-qualified before?

    A. Not professional. I've never hired a person that had a profession before, no, sir.

Woody's paralegal background rendered her over-qualified for this "monotonous" position, then the same reasoning should have applied to Webb. Following objective criteria, the AES certified Woody as being qualified for the position.

An employer's true motive in an employment decision is rarely easy to discern. Unless we thoroughly investigate these motives, employers violating Title VII's mandate may easily mask their behavior behind pretrial rationalizations.[2] Given the evidence in this case, Woody proved that Judge Wyatt's proferred reasons are unworthy of credence. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

Further, I find that the district court misapplied the evidentiary proof required in Title VII actions. The district court stated in pertinent part as follows:

> [T]he plaintiff 'has the burden of persuading the trier of fact that defendant has committed intentional discrimination.' If indeed he can prove a prima facie case, the burden shifts to the employer to 'articulate a legitimate, nondiscriminatory reason for its acts with regard to the plaintiff.... Even had the plaintiff proved a prima facie case, her attempt to establish pretext on the part of the defendant has failed.... The court has found no grounds for believing that the employment decisions were *tempered by racial biases* in this case. [Citations omitted] [emphasis added].

This ruling constitutes a misapplication of the law. Woody should not have been required to establish that Judge Wyatt's employment decisions were racially motivated in order to demonstrate discrimination. As stated earlier, the *Burdine* Court noted that an applicant can demonstrate discrimination either directly "or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 804–05, 93 S.Ct. 1817, 1825–26, 36 L.Ed.2d 668 (1973); *see generally Aikens*, 460 U.S. at 716–17, 103 S.Ct. at 1482–83. Thus, Woody should not have been required to establish that Wyatt's reasons for rejecting her were racially motivated; rather, the law only required that she establish that Judge Wyatt's profferred reasons for the employment decisions were not the true reasons, but merely pretextual. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

I also disagree with the majority's conclusion that the district court was not clearly erroneous when it determined that Woody was not as well qualified as the other applicants. Notwithstanding the AES's certification as to qualifications, Judge Wyatt established his own criteria. For instance, in October, 1984, Judge Wyatt hired Webb, reasoning, in part, that because her husband worked in the area, she would not likely relocate and seek employment elsewhere. At no time did Judge Wyatt direct questions to the applicants or otherwise inquire concerning residency intentions or marital status. Nevertheless, a review of the record indicates that he deemed such factors important.[3] Judge

---

Q. Isn't it true that you hired Pam Webb in 1984 who was a legal secretary?
A. She had had some legal—
Q. Some legal secretary skills?
A. She had had some legal secretarial experience, and that's the one that you were referring to a minute ago that I told you I'd be glad to explain.

The court found that Webb had seven and one-half years experience as a legal secretary.

2. The treatment of Woody's qualifications is a bit confusing. In summary, the record shows: Judge Wyatt, in testimony before the EEOC and in deposition gave as the reason for not hiring Woody that she was over-qualified; at trial, Judge Wyatt stated he did not hire Woody because she was not as well qualified.

The district court found that Woody did not establish a prima facie case because she was over-qualified, but also found no intentional dis-

crimination because she was not as well qualified.

3. In Judge Wyatt's trial testimony, the following conversation ensued:
Q. Did you ever ask Ms. Woody if she was married?
A. No.
Q. Did you ever inquire if she was married?
A. No. I still don't, and it wouldn't matter to me. I've got married, and I've got single folks.

Nevertheless, further in the testimony Judge Wyatt states:
Q. As I understand your testimony then, the marital status of Ms. Webb and her husband had an effect on your decision to hire her; isn't that correct?
A. The only effect—
Q. Isn't that your testimony that you've just gone through?

Wyatt knew from some source that Webb was likely to remain in the area. He knew, from some source, that her husband was the manager of the Alabama Power office, that her husband had recently transferred from a previous job, and that her husband would probably become a permanent resident in the area. Wyatt made no effort to determine whether Woody was likely to remain in the area.

Secret, unannounced, subjective criteria cannot satisfy the employer's burden of producing legitimate, nondiscriminatory reasons for an applicant's rejection. *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1557 (11th Cir.1983); *Harris v. Birmingham Board of Education*, 712 F.2d 1377, 1384 (11th Cir.), *reh'g denied*, 718 F.2d 1115 (1983). "We have recognized that such subjective procedures can lead to racial discrimination, both because important information may be available only to whites and because such procedures place no check on individual biases." *Carmichael*, 738 F.2d at 1133 (footnote omitted) (other citations omitted). An employer's failure to establish objective standards and procedures for hiring is a discriminatory practice. *Id.* The AES promulgated no objective standards or policies regarding residency in the county or marital status; however, Judge Wyatt incorporated these factors without affording Woody the opportunity to address them. The record shows that Woody has substantial ties to the Ashville community, and she is politically active in the area. Important subjective qualifications affront the patent purposes of Title VII, especially where applicants are led to believe that their qualifications have been certified based on objective standards.

By moving the qualifications question to agencies free from the influence of the ultimate employer, states and officials interested in fair employment practices thought they had eliminated the long practiced "catch 22" which resulted in the black

A. The only effect that it has was whether it would help her stay there or not.

When asked again whether Webb's marital status had a bearing on his decision, Judge Wyatt responded:

applicant always being under or over-qualified.

On the record as a whole, I would hold that the district court erred.

A. That had a bearing on it, it sure did, but her seventy-five words a minute had a very important bearing on it too. And we've got some sheets we'd be glad to show you.