Marina COOPER–HOUSTON, Plaintiff,

v.

SOUTHERN RAILWAY COMPANY, Defendant.

Civ. A. No. 1:90–CV–0575–JOF.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 23, 1993.

Allan Leroy Parks, Jr., Theresa L. Kitay, Kirwan, Goger, Chesin & Parks, Atlanta, GA, for plaintiff.

Patricia B. Cunningham, Carey P. De-Deyn, Sutherland, Asbill & Brennan, Atlanta, GA, for defendant.

## ORDER

FORRESTER, District Judge.

This matter is before the court on Defendant Southern Railway Company's and Plaintiff Marina Cooper–Houston's objections to the Special Master's report. As Special Master, Magistrate Judge William L. Harper conducted a two-day trial without a jury. Following this proceeding, he found that Defendant had violated Title VII and recommended that Plaintiff be reinstated to her position in the security department and awarded back pay relief. The magistrate judge, however, denied Plaintiff's motion to apply the Civil Rights Act of 1991 retroactively to this case.

Specifically, the magistrate judge found that Plaintiff had presented sufficient direct evidence that her supervisor, Chief Waggoner, had terminated Plaintiff as a result of his racially discriminatory animus towards blacks. He also found that Southern Railway did not show that absent the racially discriminatory animus of Chief Waggoner, Plaintiff would have been discharged anyway for the alleged violation of the company's confidentiality policy.

## I. LEGAL REVIEW

 Pursuant to Internal Operating Procedure Rule 920–2, a magistrate judge may hear and consider evidence and conduct a full trial in Title VII cases. The findings of facts in such cases may not be set aside by a district court unless "clearly erroneous." *Wheeler v. City of Pleasant Grove*, 896 F.2d 1347, 1350 (11th Cir.1990) (citing *Pullman–Standard v. Swint*, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982) ); *Parker v. Dole*, 668 F.Supp. 1563 (N.D.Ga.1987). Legal conclusions, however, are evaluated independently. *Wheeler*, 896 F.2d at 1350. Furthermore, factual findings influenced by legal error are subject to *de novo* review. *Lincoln v. Board of Regents*, 697 F.2d 928, 939 n. 13 (11th Cir.1983). If application of the wrong legal standard does not "taint or infect" the magistrate judge's factual findings, however, then the "clearly erroneous" standard applies. *Id.*

 Defendant challenges the magistrate judge's finding of direct evidence of discrimination. Under Title VII direct evidence may be presented to prove the plaintiff's *prima facie* case of showing discriminatory motive in the decision to discharge. *Wall v. Trust Company of Georgia*, 946 F.2d 805, 809 (11th Cir.1991); *Walters v. City of Atlanta*, 803 F.2d 1135, 1143 (11th Cir.1986). When a plaintiff makes this showing of an intent to discriminate on the account of race, the defendant must rebut the presumption that the discharge decision was improperly motivated by proving by a preponderance of the evidence that the same decision would have been reached even absent the impermissible factor. *Wall*, 946 F.2d at 809; *Wil-*

son v. City of Aliceville, 779 F.2d 631, 634 (11th Cir.1986).

■ Of course, once the case has been tried on the merits, the court is no longer concerned with whether the plaintiff made out a *prima facie* case. Rather, the ultimate question of whether the defendant intentionally discriminated against the plaintiff may be addressed directly. *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *Woody v. St. Clair County Commission,* 885 F.2d 1557, 1560 (11th Cir.1989).

Defendant does not argue that the magistrate judge misstated these principles. Rather, Defendant argues that the magistrate judge erred in considering the racial remarks made because they were either made by persons unrelated to the discharge decision or not made directly referring to the plaintiff.

Defining what kinds of statements constitute direct evidence of discriminatory motive and thus do not require an inference in showing a Title VII violation is difficult. The Eleventh Circuit has held that a generalized racist explanation of a hiring policy constitutes direct evidence. *Miles v. M.N.C. Corp.,* 750 F.2d 867, 873–76 (11th Cir.1985) (in response to a question of why the company had no black employees, supervisor responded, "half of them weren't worth a shit."); *Wilson,* 779 F.2d at 634 (mayor stated, "He wasn't gonna let no federal government make him use no ... damn nigger" is probably direct evidence); *compare Bell v. Birmingham Linen Service,* 715 F.2d 1552, 1557 (11th Cir.1983) (in a sex discrimination case, direct evidence found where supervisor stated that he would not put Plaintiff in the washroom because if he did "every woman in the plant would want to go into that washroom"). "[S]tray remarks in the work place ..., statements by non-decisionmakers ..., [or] statements by decisionmakers unrelated to the decisional process itself," however, do not constitute direct evidence. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 1804, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring); *see also EEOC v. Alton Packaging Corp.,* 901 F.2d 920, 924 (11th Cir.1990) (citing O'Connor's concurrence favorably).

## II. FACTUAL BACKGROUND

### A. *The Events Leading to Dismissal*

Southern Railway's internal police division provides police protection to its properties and rail systems and investigates crimes committed against the railroad or on company property. The police division employees are subject to rules and responsibilities set forth in a policy and procedure manual. This manual contains the following confidentiality rule:

*Confidentiality to be Maintained—*

Confidentiality shall be maintained. The affairs of the company and the department must not be disclosed, nor access to the company's records permitted, without proper authority. Employees shall not divulge confidential information or exhibit contents of any official file or criminal record file except by proper police authority or due process of law.

In 1988, the Georgia Division began an investigation of drug sales and use by company employees. Plaintiff assisted Special Agent Haynes, another black agent, in this investigation. Although the investigation was intended to be kept confidential, there was some evidence that at some point it became common knowledge among Southern Railway employees because of the interviews of various witnesses and suspects. Plaintiff herself was not present at such interviews but overheard discussion between other employees about the ongoing drug investigation.

As of early 1989, however, the only employees who had been questioned were Charles Williams, Doug Cunningham and Leonard Price. Special Agent Haynes also interviewed Anthony Jenkins, a former employee, at Jenkins' house at this time. When Haynes returned to the office from this interview, he told Plaintiff that Jenkins had not wanted him to come into the house. Haynes stated that he believed that Jenkins had been using drugs immediately prior to the time of the interview and that this was the reason Jenkins would not let him into the house.

In an interview with employee Charles Williams in February, Williams stated to Haynes and Witt that he had asked Plaintiff what was "going on" and that she had replied that the Georgia Division was using "high-tech" machines in the investigation. Williams also suggested that an employee outside the Georgia Division had received information about the investigation from Plaintiff.

Following Williams' statement, Haynes and Witt brought this information to Deputy Chief John Hartman, who was directing the investigation. Thereafter, Hartman interviewed Williams himself. Williams related the same story and also volunteered details about the interview Haynes had had with Anthony Jenkins, including details supposedly known only by Haynes and Jenkins. Williams suggested that Vera Johnson had received this information from Plaintiff.

Chief Waggoner conceded in his testimony at trial that Williams' statements alone were insufficient to conclude that Plaintiff had told Vera Johnson. The police division, however, did equip Williams with a tape recorder to record his conversations with other employees.

After Hartman interviewed Williams, Haynes advised Hartman that he had told Plaintiff about his interview with Anthony Jenkins. Hartman then interviewed Vera Johnson. Also at this interview were Cheryl Hargrett (who later replaced Plaintiff) and Lieutenant Witt. Vera Johnson stated that Plaintiff had spoken to her about the drug investigation and provided details about the Jenkins interview. Hartman then played a portion of a tape recording made by Williams of a conversation with Vera Johnson. The excerpt was a statement by Vera Johnson that the "special services was also targeting black people." Johnson stated at trial that she had made this statement in the presence of Charles Williams, Derek Walker and Plaintiff.

The magistrate judge found that Johnson believed her own conduct was at issue in the investigation and that she thought she was in danger of disciplinary action when she spoke in this interview.

Following the interview with Vera Johnson, Hartman met with Haynes. They discussed Haynes' visit to Jenkins' home and how information regarding that visit could have become known to Johnson. Hartman acknowledged that one possible source was Jenkins himself.

In reporting to Chief Waggoner, Hartman provided the written statements of Charles Williams and Vera Johnson. He also provided a written statement of Special Agent Haynes, as well as the written record of Hartman's discussions with Haynes. Hartman informed Waggoner that Plaintiff and Jenkins were the possible sources of a disclosure. Hartman concluded, however, that based on his investigation, he believed Plaintiff had disclosed the information about the investigation to both Johnson and Williams.

Chief Waggoner did not conduct any investigation himself. After Hartman's report, he concluded that Plaintiff disclosed the information. On April 24, 1989, Chief Waggoner, along with his supervisor, Steve Hanes, met with Plaintiff. Waggoner told her that they had information that she had leaked confidential matters. He pointed out the reported disclosure of information to Vera Johnson regarding the Haynes interview with Jenkins and reported conversation with Charles Williams, where she allegedly told him that "high tech" machines were being used by the investigators. **Plaintiff admitted that she had participated in these conversations where the investigation was discussed** but denied that she leaked confidential information. She also stated she did not have access to any confidential information.

After the meeting Waggoner terminated Plaintiff. His dismissal letter stated:

This is to notify you that, effective immediately, you are dismissed from all service with Southern Railway Company in connection with your conduct unbecoming an employee and failure to comply with police department policy in that you interfered with and leaked information about an investigation being conducted concerning drug activities at the Atlanta general office building.

At trial Chief Waggoner stated that he did not know what motive Plaintiff could have

had to leak information and that she had not leaked information in the past.

### B. *What Was The Motive?*

So far as the evidence shows, Chief Waggoner was the sole decision-maker in the termination of the Plaintiff. The court's duty is to determine what motivated him.

Some have contended that racism is endemic in the human condition, and the extent to which it affects choices is simply a question of degree. If this is true, it would seem equally true that racism does not affect every choice made about a person of another race, and it would seem equally true that a person with strong racist feeling may on occasion make an adverse choice about a person of another race for neutral and just reasons. The task for a fact-finder is to divine motive. In an area where courts have opted for algebraic forms of analysis, this court offers another set of equations that realistically views and evaluates motivating intent where there is substantial evidence that a decision-maker's general view of the worth of others is influenced by class-based animus.

People ordinarily act on the basis of their predilections. So, in a case where there is substantial evidence that a decision-maker possesses a substantial class bias, it may be inferred that an adverse employment action against a member of the class was inspired by impermissible considerations. This inference is, of course, rebuttable. It may be rebutted where the stated reason for the action has provoked similar adverse action against non-class members, where a reasonable person would view the action as just under all the circumstances, or where other contemporaneous actions are inconsistent with the inference (e.g., replacement from the same class or retaining some from the class while laying off others).

As a preliminary matter this court finds no evidence that under controlling law would amount to direct evidence. In 1985, Chief Waggoner said, "two down and one to go." The magistrate judge found that he made this statement referring to the plaintiff after two men, one a reputed homosexual and the other a Filipino, Jules Llorente, had been transferred in 1985. Here, the magistrate judge erred. The statement attributed to Waggoner, "two down, one to go" was made in 1985. Plaintiff was discharged in 1989. Although Kenneth Whaley thought the statement referred to Plaintiff, this was mere unsupported conjecture. Further, even if it was intended to refer to Plaintiff, it does not evidence a desire to terminate her on account of her race. There was one other black employee (Bray) in the Georgia division in 1985, and, therefore, if Chief Waggoner "had it in" for the Plaintiff, it is clear that he did not consider her an undesirable on account of her race or he would have said, "... two to go." Furthermore, the length of time between the making of the statement and the actual decision to discharge was too extenuated to show directly what Chief Waggoner's motive was at the time of the actual termination.

A trier of fact is left to sift the circumstantial evidence for evidence of Chief Waggoner's intent. Much of what Plaintiff introduced pertained to racist attitudes of other supervisors or co-workers. The evidence as it pertains to Waggoner is as follows.

Plaintiff Cooper–Houston, a black female, began work for Southern Railway Company as a keypunch operator in 1969. She was later promoted and became a special agent assigned to the Georgia Division of Southern Railway's Internal Police Department. As a special agent, Plaintiff's duties were primarily administrative and clerical. She had regular contact with employees from within her division, as well as outside her office. She was not certified as a police officer in Georgia and, therefore, did not perform investigative duties. She never submitted a written request to become certified. At trial, however, she testified that she did speak with the Division Chief, Robert L. Waggoner, and requested the opportunity to seek certification. Lack of certification, however, was not unusual for the special agents in the Police Division who did mostly administrative and clerical work. One other black employee and three other white employees were not certified.

From April 8, 1985 until April 24, 1989, Chief Waggoner supervised the Georgia Divi-

sion and the plaintiff. He was assigned as Division Chief at the same time that Plaintiff started at the Georgia Division. When Waggoner and Plaintiff started, two administrative employees, Gerald Perry and Charlene Bruce, both white, had been working in the Georgia Division approximately twenty and six years, respectively. Another employee, Jules Llorente, a Filipino, transferred to another Southern Railway division shortly after Plaintiff started.

When Chief Waggoner took over, he and Captain M.E. Calloway worked to distribute job responsibilities within the division. Chief Waggoner asked Gerald Perry to assist Plaintiff with some of the new procedures. Calloway asked Llorente, Bruce, and Plaintiff to list their previous assignments and identify problems in order to gauge any needed adjustments in job responsibilities. Because of the varying needs of the Georgia Division, office employees, including Plaintiff, were subject to varying work schedules, including having to work occasionally on weekends and having to adjust their lunch schedules. Since Plaintiff wished to attend church on Sunday, she worked Tuesday through Saturday. Charlene Bruce and Gerald Perry worked Sunday through Thursday. These staggered schedules ended in late 1986, and Perry, Bruce, and Plaintiff returned to a Monday through Friday schedule for the remainder of Plaintiff's tenure.

Chief Waggoner also required at least one of these three employees to cover the office from 11:00 a.m. to 1:00 p.m. Bruce, Perry and Plaintiff regularly accommodated one another to meet this requirement, including allowing Plaintiff to attend the women's transportation seminars on most occasions.

Plaintiff often ate lunch with other employees, including Muriel Bray, a black female sergeant assigned to the headquarters, which were located in another building. Chief Waggoner asked Plaintiff not to eat lunch with Bray at headquarters. Chief Waggoner testified that this direction had been based on a request from headquarters, but he was unable to name who had made the request or exactly why the request was made. No such direction as to with whom to eat or where was given to other employees.

Although Plaintiff's prior experience included working at headquarters, the magistrate judge noted that Chief Waggoner never selected the plaintiff when headquarters requested extra office assistance from the Georgia Division. No evidence was presented as to who from the office was ever selected by Waggoner.

The magistrate judge also noted in his findings that Plaintiff drank milk regularly to ease pain from her ulcers. Chief Waggoner made no comments regarding the beverages drunk by other employees, but asked Plaintiff why she drank milk during the day instead of soft drinks.

Chief Waggoner called a black suspect being observed "that invisible nigger," while working surveillance with Special Agent Bruce Haynes. An employee testified that Chief Waggoner admitted he used the term "nigger" but indicated that he intended to apologize. Waggoner denied making these statements, but the magistrate judge found these denials to lack credibility. Haynes also added that Chief Waggoner used the word "nigger" again at a social gathering of employees.

■ On this evidence it may fairly be said that Chief Waggoner did not hold black people in equal respect. On the occasion of the discharge, however, he had more than ample evidence to believe that Plaintiff had violated a written policy, and an important one at that. It is fundamental to investigative work that the fact of an investigation and its details should be held confidential to protect both the investigation and the privacy interests of persons being investigated. There is no evidence that others leaked details of the investigation and went unpunished. A reasonable person would view the termination as just, and there being no other evidence that the chief's general attitudes played a part in the decision, the magistrate judge was clearly in error in finding that the plaintiff was terminated because of her race. His error seems to have been occasioned by the introduction of so much evidence of the attitudes of others in the work place.

### B. *Civil Rights Act of 1991*

 Plaintiff objects to the magistrate judge's refusal to allow Plaintiff to proceed under the Civil Rights Act of 1991. This court found in *Peters v. Board of Regents,* 1992 WL 252134 (N.D.Ga.1992), that the Act does not apply retroactively to conduct occurring before the effective date. Subsequently, the Eleventh Circuit has addressed the retroactivity of the 1991 Act. *Curtis v. Metro Ambulance Service, Inc.,* 982 F.2d 472 (11th Cir.1993); *Baynes v. AT & T Technologies, Inc.,* 976 F.2d 1370 (11th Cir.1992). In *Baynes* the court found that the Act was prospective. The case before the court, however, only allowed it to rule that the Act is prospective in cases where judgment was entered before the Act's effective date. *Id.* at 1375. The court extended this reasoning in *Curtis* holding that the Act also is not retroactive in cases which were pending but had not reached final judgment as of the effective date of the Act. In this case, the actual trial began on the effective date of the Act and, therefore, is controlled by *Curtis.* The magistrate judge's finding, therefore, was not in error.

### III. CONCLUSION

Defendant's and Plaintiff's motions for consideration of objections to the Special Master's Report are GRANTED [56–1, 57–1]. Defendant's motion for oral argument is DENIED as moot [56–2]. Defendant's motion to extend time is DENIED as moot [59–1, 61–1]. Full consideration could be given based on the briefs. Defendant's motion to file a brief in excess of the page limitation, although filed out of time, is GRANTED [62–1]. As set forth above, the court REJECTS the Special Master's Report IN PART and MODIFIES it IN PART. The Clerk of Court is ORDERED to ENTER JUDGMENT in favor of Defendant and to DISMISS this action.

SO ORDERED.